Melinda Jane Steuer (SBN: 216105)
The Law Offices of Melinda Jane Steuer
1107 Second Street, Suite 230
Sacramento, CA 95814
Telephone: (916) 930-0045
Facsimile: (916) 314-4100
msteuer@californiainvestoradvocate.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN R. MARSHALL, an individual; and THE JOHN MARSHALL IRREVOCABLE TRUST DTD FEBRUARY 14, 2017, through its trustee, Michael A. Marshall,<br><br>                    Plaintiffs,<br><br>vs.<br><br>AMERIPRISE FINANCIAL SERVICES, INC., a foreign corporation,<br><br>                    Defendant. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>**1) INTENTIONAL MISREPRESENTATION;**<br>**2) NEGLIGENT MISREPRESENTATION;**<br>**3) FRAUD BY OMISSIONS;**<br>**4) CHURNING; AND**<br>**5) BREACH OF FIDUCIARY DUTY**<br><br>**UNLIMITED JURISDICTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs complain and allege as follows:

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

1.    John R. Marshall is, and at all times herein relevant was, a resident of the State of California who has resided in Sacramento, California, at all relevant times.

2.    The John Marshall Irrevocable Trust ("Trust") is, and at all times relevant was, a California Irrevocable Trust formed under the laws of the State of California, with its principal

place of business in Sacramento, California.  Michael A. Marshall has been the trustee of the Trust at all times since its formation.

3.   Plaintiffs are informed and believe, and thereon allege, that Defendant AMERIPRISE FINANCIAL SERVICES, INC. ("AMERIPRISE") is, and at all times relevant was, a foreign corporation, doing business throughout the State of California.

4.   Plaintiffs are informed and believe, and thereon allege, that Defendant AMERIPRISE is, and at all times relevant was, a licensed securities broker-dealer.  Plaintiffs are informed and believe, and thereon allege, that Defendant AMERIPRISE, at all times herein relevant, was licensed to do business in the State of California, and did do business in the State of California, including with Plaintiffs.

5.   The District Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332.

6.   Ameriprise's liability, alleged herein, arose in the Counties of Sacramento and Placer.  Plaintiffs' damages occurred in the County of Sacramento.  The financial advice, breaches of fiduciary duty, material omissions, and negligent acts and omissions, alleged herein, were made and occurred in the Counties of Placer and Sacramento, through meetings in the County of Placer, and in documents delivered to Plaintiffs in the Counties of Placer and Sacramento. Plaintiffs signed the documents to make the transactions at issue in the Counties of Sacramento and Placer.  For each and all of those reasons, venue in the Eastern District of California is appropriate.

7.   Plaintiffs are informed and believe, and thereon allege, that Kambiz Ghazanfari ("Ghazanfari"), at all times herein relevant, was a registered representative, authorized agent, and employee of AMERIPRISE.  Plaintiffs are informed and believe, and thereon allege, that, all times herein relevant, Ghazanfari was acting as an agent of Defendant AMERIPRISE within the scope and course of such agency, in doing the acts herein alleged.

8.   John Marshall ("J. Marshall") first opened investment accounts with Ghazanfari at AMERIPRISE around 2000.  Ghazanfari, at all times relevant, was a registered representative of AMERIPRISE.  Ghazanfari continued to be the financial advisor for J. Marshall until Ghazanfari passed away on December 23, 2020.  After J. Marshall formed the Trust, Ghazanfari

served as the financial advisor for it as well.  Over the years, J. Marshall developed a strong relationship of trust and reliance in Ghazanfari.  J. Marshall considered Ghazanfari to be a friend.  J. Marshall would also often seek out Ghazanfari's advice on financial and real estate transactions that were not part of his or the Trust's AMERIPRISE accounts because he had so much faith in Ghazanfari's judgment.   J. Marshall would always do whatever Ghazanfari advised.

9.   Between 2009 and 2012, Ghazanfari strongly recommended to J. Marshall that he invest a substantial portion of the assets in his non-retirement accounts into variable annuities. Ghazanfari told J. Marshall that the variable annuities would grow tax-free, which would be a great benefit for him because of his tax bracket.  Ghazanfari told J. Marshall that the variable annuities would generate a return of 9% to 10% a year.  Mr. Ghazanfari explained to J. Marshall that, while this anticipated return was significantly less than the return on stocks, it would be well worth it for him because his principal would be completely safe and he would not have to pay taxes on the growth.  Ghazanfari gave J. Marshall the impression that variable annuities were a similar investment to municipal bonds in terms of their safety and their tax benefits. Ghazanfari told J. Marshall that the variable annuities would have very low costs.  Ghazanfari emphasized that variable annuities were a great investment for higher earners for tax reasons. Ghazanfari also assured J. Marshall that he could take monies out of the variable annuities whenever he wished.  Ghazanfari did not tell J. Marshall that he would incur penalties on withdrawals from the variable annuities for the first seven years that he held them.  Mr. Ghazanfari also did not disclose the fees and commissions which he made on the variable annuities.

10.   On July 2, 2009, J. Marshall invested $200,000 into a variable annuity issued by Sun Life, through Ghazanfari and AMERIRPISE ("Sun Life annuity"), based upon Ghazanfari's recommendation and advice.

11.   On August 18, 2011, J. Marshall invested $300,000 into a variable annuity issued by Met Life, through Ghazanfari and AMERIRPISE ("Met Life 1 annuity"), based upon Ghazanfari's recommendation and advice.  On January 1, 2012, J. Marshall invested an

additional $147,000 into the Met Life 1 annuity, based upon Ghazanfari's recommendation and advice.

12.   On November 14, 2012, J. Marshall invested $150,000 into a second variable annuity issued by Met Life, through Ghazanfari and AMERIRPISE ("Met Life 2 annuity"), based upon Ghazanfari's recommendation and advice.

13.   In total, $797,000 of J. Marshall's investment accounts were invested into variable annuities as of the end of 2012.

14.   Ghazanfari added income riders for which an extra fee was charged to all of the annuities which Ghazanfari/AMERIPRISE had sold to J. Marshall.  At the time Ghazanfari sold the foregoing annuities, J. Marshall was working full-time and earning a high level of income as an insurance agent specializing in property and casualty insurance.  J. Marshall had repeatedly told Ghazanfari that he never intended to retire, and that he would work until he was no longer able to do so.  J. Marshall therefore did not need income riders because he had no current or anticipated need for guaranteed income.  J. Marshall had never requested the income riders.   J. Marshall was not aware that income riders had been added to the variable annuities.  Ghazanfari did not tell him that.  J. Marshall did not read the paperwork related to the variable annuities because he is dyslexic and therefore reading is difficult and time-consuming for him, and because of his total trust in Ghazanfari.

15.   J. Marshall formed the Trust on February 14, 2017 for the benefit of his children. Shortly thereafter, J. Marshall caused the ownership of the variable annuities to be transferred to the Trust for valuable and adequate consideration.  J. Marshall's brother, Michael Marshall ("M. Marshall"), has been the sole trustee of the Trust at all time since its inception.

16.   The Sun Life annuity had a seven-year surrender period during which it could not be liquidated without having to pay a penalty.  On June 12, 2018, about a week after the surrender period ended, Ghazanfari caused the Sun Life annuity to be surrendered and the proceeds to be invested into a new variable annuity issued to the Trust by RiverSource, which is a company affiliated with AMERIPRISE ("RiverSource annuity").  The Trust followed Ghazanfari's advice to transfer the monies from the Sun Life annuity to the RiverSource annuity

because of its settlor J. Marshall's longstanding relationship of trust and reliance with Ghazanfari.  By advising the Trust to surrender the Sun Life annuity and use the proceeds to purchase the RiverSource annuity, Ghazanfari caused the Trust to be locked into a new seven-year contract during which it could not surrender the RiverSource annuity without having to pay substantial penalties.

17.  Ghazanfari added an income rider for which the Trust was charged an additional fee to the RiverSource annuity.  The addition of an income rider to the RiverSource annuity was completely unjustified because the RiverSource annuity was purchased by the Trust, which is an irrevocable trust.  The beneficiaries of the Trust are J. Marshall's children, who are young people at the start of their working lives, and who do not have any need for guaranteed income.

18.  The representations and explanations which Ghazanfari provided in support of his recommendations to purchase the variable annuities were inaccurate and/or misleading.  Specifically, growth on variable annuities is tax-deferred, not tax-free.  At the time the Sun Life and Met Life annuities were sold to J. Marshall, he did not need tax deferral because he was not planning to retire.   Tax deferral also provided no benefit to the Trust, who was the purchaser of the RiverSource annuity.  In addition, if capital gains taxes were a major concern for J. Marshall and/or the Trust, then Ghazanfari could have used exchange-traded funds, which do not incur taxable capital gains, to mitigate potential tax consequences.

19.  Ghazanfari's representations about the costs, anticipated performance, and safety of the variable annuities were equally misleading.  In fact, variable annuities have very high internal fees and costs.  Moreover, variable annuities typically have low growth, which is much less than the historical average of 7% to 9% annually for mutual funds and/or individual stocks, because of their high internal fees and because the variable annuity accounts do not perform as well as the mutual funds which they are designed to mirror.  In other words, variable annuities provide poor performance combined with high fees.  In addition, the variable annuities were invested into market investments and subject to market risk, unless a rider was purchased to protect the principal at an additional fee.  Ghazanfari did not tell J. Marshall and/or the Trust

/ / /

that they were paying additional monies for the principal protection which he had told them was an inherent feature of the annuities.

20.   Ghazanfari's representations that J. Marshall and/or the Trust could take monies out of the variable annuities whenever they wished were misleading because they would have to pay steep penalties if they withdrew more than ten percent (10%) from the annuities during the first seven years following their purchase.  J. Marshall and the Trust never withdrew any monies from the variable annuities and therefore did not find out about the surrender penalties until several months after Ghazanfari had passed away.

21.   Ghazanfari passed away unexpectedly on December 23, 2020.  Shortly thereafter, J. Marshall's and the Trust's accounts at AMERIPRISE were re-assigned to another Ameriprise representative, Cable Doria.

22.   In a conversation which occurred around August/September 2021, Mr. Doria provided information about the variable annuities which caused J. Marshall to be concerned that they were not good investments.  Specifically, Mr. Doria informed J. Marshall that the Trust would have to pay penalties if it withdrew monies from the variable annuities.  Mr. Doria also informed J. Marshall that the growth on the annuities was tax-deferred, not tax-free.   Mr. Doria informed J. Marshall that variable annuities have all of the risk of a loss in principal as stock market investments.  Mr. Doria also implied that variable annuities are expensive investments that do not produce a good return, and that he would not have utilized them.

23.   J. Marshall was shocked by the information which Mr. Doria had provided.  He was particularly upset because Ghazanfari was well aware that J. Marshall had been defrauded with respect to outside investments that he had made.  J. Marshall had always felt that Ghazanfari was the one person who he could totally trust for financial advice.   He could not believe that Ghazanfari had taken advantage of him by selling him and the Trust expensive and low-performing investments, and that AMERIPRISE would have allowed Ghazanfari to do so.

24.   As a result of J. Marshall's conversation with Mr. Doria and what he had learned about the annuities, Plaintiffs decided that they did not want to keep any of their assets with AMERIPRISE.  In October 2021, Plaintiffs caused all of their assets to be transferred to another

broker-dealer, with the exception of the RiverSource annuity which cannot be transferred.  The Trust surrendered the Met Life variable annuities in December 2021.  The Trust still owns the RiverSource annuity because it purchased the RiverSource annuity less than seven years ago and would therefore have to pay a large penalty if it was surrendered at this time.

25.  Plaintiffs are informed and believes, and thereon allege, that the variable annuities which AMERIPRISE sold to the Trust and to J. Marshall, through AMERIPRISE's agent Ghazanfari, were unsuitable for the Trust and J. Marshall, and primarily benefitted AMERIPRISE and Ghazanfari.

26.  Ghazanfari held himself out to have great experience and expertise in the area of financial planning and investments than Plaintiffs.  Plaintiffs is informed and believes, and thereon allege, that Ghazanfari intentionally presented himself as having great experience and expertise in financial planning and investments, so that Plaintiffs would rely upon him.  As a result, Plaintiffs reposed trust and confidence in Ghazanfari and relied upon Ghazanfari for investment and financial advice.  Ghazanfari was Plaintiffs' broker and financial advisor.  For each and all of these reasons, Ghazanfari owed a fiduciary duty to Plaintiffs.

27.  Defendant AMERIPRISE, as the broker/dealer employing Ghazanfari as its registered representative, had a fiduciary obligation to Plaintiffs to properly supervise Ghazanfari, to establish a reasonable system of supervision and controls with respect to Ghazanfari, and to ensure that Plaintiffs' funds were properly invested and that the investments made on their behalf were suitable.  The relationship between Plaintiffs and AMERIPRISE was fiduciary in nature.  It was characterized by trust and confidence on the part of Plaintiffs toward AMERIPRISE and its agent, Ghazanfari, which trust and confidence was encouraged by AMERPRISE and its agent, Ghazanfari.

28.  Plaintiffs have suffered substantial damage as a result of the wrongful conduct alleged herein.  Specifically, Plaintiffs lost much of the benefit of the significant growth in the stock market that occurred in the many years that passed between when the Sun Life and Met Life annuities were purchased and when they were surrendered.  The Trust has also continued to lose the benefit of the substantial stock market growth since the RiverSource annuity was

1  purchased.  J. Marshall had substantially less money at the time the Trust was formed, and the

2  beneficiaries of the Trust will receive significantly less money, as a result.

3      29.  Plaintiffs did not discover the wrongdoing alleged herein until August/September of

4  2021.

5  ### FIRST CAUSE OF ACTION

6  ### FRAUD - INTENTIONAL MISREPRESENTATION

7  **(Against All Defendants)**

8      30.  Plaintiffs re-allege and incorporate by reference each and all of the preceding

9  paragraphs, as if set forth fully herein.

10      31.  Defendant AMERIPRISE, through its authorized agent and apparent agent

11  Ghazanfari, made the following representations to Plaintiffs regarding the variable annuities:

12      A.  The monies invested in the variable annuities would grow tax-free;

13      B.  The variable annuities would generate an annual return of 9% to 10%;

14      C.  The variable annuities had and would continue to have very low costs.

15      32.  The foregoing representations were made verbally at meetings which J.

16  Marshall had with Ghazanfari at Ghazanfari's office in Roseville, California at the time

17  Plaintiffs purchased the respective variable annuities or shortly before the variable annuities

18  were purchased.

19      33.  Plaintiffs are informed and believe, and thereon allege, that Ghazanfari

20  knew that the foregoing representations were false, when he made the foregoing representations,

21  or that he made the foregoing representations recklessly, knowing that he did not know whether

22  his representations were true or false, and in conscious disregard of Plaintiffs' interests.

23      34.  The true facts were as follows:

24      A.  Growth within the variable annuities was tax-deferred, not tax-free;

25      B.  There was no reasonable or realistic probability that the variable annuities

26  would have 9% to 10% growth a year because: i) the variable annuities have high internal fees

27  and costs which significantly reduced their growth potential; ii) sub-accounts of the variable

28  annuities have historically poor performance which is inferior to the mutual funds they are

designed to mirror; and iii) a substantial portion of the monies that were invested into the variable annuities were allocated into bonds which do not have growth that is anywhere close to 9% or 10% a year;

C.  The variable annuities have very high costs and internal fees.

35.  Plaintiffs were unaware of the falsity of Ghazanfari's representations and believed his representations to be true.  Plaintiffs reasonably trusted and relied upon Ghazanfari, who held himself out to be knowledgeable and to have a high degree of expertise in the fields of financial planning, wealth management, and investments.

36.  Plaintiffs are informed and believe, and thereon allege, that Ghazanfari made the foregoing representations with the intent of deceiving Plaintiffs into investing substantial monies into the variable annuities, thereby obtaining large commissions for himself and AMERIPRISE.

37.  In reliance upon the representations of AMERIPRISE's agent, Ghazanfari, Plaintiffs purchased the Sun Life annuity, the Met Life annuities and the RiverSource annuity.

38.   As a direct and proximate result of the intentional and/or reckless misrepresentations alleged herein, Plaintiffs have suffered damages in an amount according to proof.

39.  As a direct and proximate result of the intentional and/or reckless misrepresentations alleged herein, Plaintiffs have suffered substantial financial losses which have resulted in severe emotional distress.

40.  The intentional and/or reckless misrepresentations alleged herein were fraudulent, malicious, willful, despicable, and oppressive.  Plaintiffs are informed and believe, and thereon allege, that the intentional and/or reckless misrepresentations alleged herein were ratified by a managing agent of AMERIPRISE.  Accordingly, punitive damages are warranted against Defendant AMERIPRISE.

/ / /

/ / /

/ / /

**SECOND CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(Against All Defendants)**

41.   Plaintiffs re-allege and incorporate by reference paragraphs 1-32 & 34-37 above, as if set forth fully herein.

42.   AMERIPRISE's agent, Ghazanfari, had insufficient information to ascertain whether his representations were true or false, and consequently made those misrepresentations negligently.

43.   As a direct and proximate result of the negligent misrepresentations alleged herein, Plaintiffs have suffered damages in an amount according to proof.

**THIRD CAUSE OF ACTION**

**FRAUD-OMISSIONS**

**(Against All Defendants)**

44.   Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs, as if set forth fully herein.

45.    Plaintiff trusted and relied upon AMERIPRISE and its agent, Ghazanfari. AMERIPRISE and its agent Ghazanfari encouraged such trust and confidence.  AMERIPRISE, through its agent Ghazanfari, held itself out as an expert in the areas of investments, securities and financial planning.  AMERIPRISE and its agent Ghazanfari offered financial and investment advice to Plaintiffs.  Ghazanfari was Plaintiffs' registered representative, securities broker and financial advisor.  Ghazanfari was a licensed securities registered representative, authorized agent, apparent agent and employee of AMERIPRISE, at all relevant times, who was acting in the scope and course of his employment in making the securities recommendations at issue herein.  AMERIPRISE, at all relevant times, was a licensed securities broker-dealer charged with responsibility for supervising its registered representatives, including Ghazanfari, and protecting its customers, including Plaintiffs.  For each and all of these reasons, AMERIPRISE and its agent Ghazanfari were Plaintiffs' fiduciaries.

/ / /

46.   As Plaintiffs' fiduciaries, AMERIPRISE, on whose behalf Ghazanfari acted, had an affirmative duty to disclose all material facts known to it about the investments and transactions which Ghazanfari recommended to Plaintiffs.  AMERIPRISE directly and through its agent Ghazanfari failed to disclose material facts regarding those investments and transactions, as alleged herein.

47.   Plaintiffs are informed and believe, and thereon allege, that AMERIPRISE and its agent Ghazanfari had exclusive knowledge of past or existing material facts pertaining to Ghazanfari's advice and recommendations, and/or to the investments at issue, which were not known nor reasonably accessible to Plaintiffs.  Accordingly, Defendant AMERIPRISE and its agent Ghazanfari had a duty to disclose those facts to Plaintiffs.  Defendant AMERIPRISE directly and through its agent Ghazanfari failed to disclose such material facts to Plaintiffs, as alleged herein.

48.   Ghazanfari, in the course of making representations of material fact to Plaintiffs on behalf of AMERIPRISE, suppressed and/or concealed material facts which were necessary to disclose, so that the statements Ghazanfari made would not be misleading, as alleged herein.  As a result of the suppression and concealment of material facts, alleged herein, the statements which Ghazanfari made were misleading.  Consequently, AMERIPRISE is liable for Ghazanfari's failure to disclose the material facts as alleged herein.

49.   Starting around June 2009, and continuously thereafter, AMERIPRISE directly and through its agent Ghazanfari omitted to disclose the following material facts:

      A.   Growth within the variable annuities was tax-deferred, not tax-free;

      B.   There was no reasonable or realistic probability that the variable annuities would have 9% to 10% growth a year because: i) the variable annuities have high internal fees and costs which significantly reduced their growth potential; ii) sub-accounts of the variable annuities have historically poor performance which is inferior to the mutual funds they are designed to mirror; and iii) a substantial portion of the monies that were invested into the variable annuities were allocated into bonds which do not have growth that is anywhere close to 9% or 10% a year;

C.  The variable annuities have very high costs and internal fees;

D.  Substantial penalties would have to be paid on withdrawals from the variable annuities that were taken within the first seven years of when they were sold;

E.  Income riders for which Plaintiffs were charged substantial additional fees had been added to each of the variable annuities that were sold to the Plaintiffs;

F.  The variable annuities paid high commissions to Ghazanfari and AMERIPRISE which were significantly higher than the commissions that Ghazanfari and AMERIPRISE received from selling mutual funds or individual stocks and bonds;

G.  The ability of the variable annuities to grow in value was severely hampered by their high internal fees and costs;

H.  The variable annuities were subject to all of the risks of investing in the stock market unless Plaintiffs paid a substantial extra fee for a principal protection rider.

50.  Plaintiffs are informed and believe, and thereon allege, that AMERIPRISE, through its agent Ghazanfari, knowingly omitted to disclose the above material facts with the intent of deceiving Plaintiffs into investing into the variable annuities and continuing to hold the variable annuities, thereby obtaining substantial fees and compensation.

51.  Plaintiffs are informed and believe, and thereon allege, that AMERIPRISE's material omissions, described above, were continuous and ongoing, from June 2009 until August/September 2021.  Plaintiffs are informed and believe, and thereon allege, that AMERIPRISE's continuing and knowing omissions were intended to deceive them into keeping their monies in the variable annuities and investing additional monies into the variable annuities, thereby generating substantial fees and compensation for AMERIPRISE and its agent Ghazanfari, and to prevent Plaintiffs from discovering AMERIPRISE's and Ghazanfari's misconduct.

52.  Plaintiffs were unaware of the true facts.   They reasonably trusted and relied upon AMERIPRISE and its agent Ghazanfari, who were their fiduciaries.

/ / /

/ / /

53.   As a direct and proximate result of AMERIPRISE and its agent Ghazanfari's material omissions, alleged herein, Plaintiffs purchased the Sun Life annuity, the Met Life annuities, and the RiverSource annuity, and retained those annuities.

54.   As a direct and proximate result of AMERIPRISE's fraud by omissions, alleged herein, Plaintiffs have been damaged in a sum according to proof.

55.   As a direct and proximate result of the material omissions alleged herein, Plaintiffs have suffered substantial financial losses which have resulted in severe emotional distress.

56.   The material omissions alleged herein were fraudulent, malicious, willful, despicable, and oppressive.  Plaintiffs are informed and believe, and thereon allege, that the material omissions alleged herein were ratified by a managing agent of AMERIPRISE. Accordingly, punitive damages are warranted against Defendant AMERIPRISE.

<u>**FOURTH CAUSE OF ACTION**</u>

<u>**CHURNING**</u>

**(Against All Defendants)**

57.   Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

58.   Plaintiff trusted and relied upon AMERIPRISE and its agent, Ghazanfari. AMERIPRISE and its agent Ghazanfari encouraged such trust and confidence.  AMERIPRISE, through its agent Ghazanfari, held itself out as an expert in the areas of investments, securities and financial planning.  AMERIPRISE, through its agent Ghazanfari, offered financial and investment advice to Plaintiffs.  Ghazanfari was Plaintiff's registered representative, securities broker and financial advisor.  Ghazanfari was a licensed securities registered representative, authorized agent, apparent agent and employee of AMERIPRISE, at all relevant times, who was acting in the scope and course of his employment in making the securities recommendations at issue herein.  AMERIPRISE, at all relevant times, was a licensed securities broker-dealer charged with responsibility for supervising its registered representatives, including Ghazanfari, and protecting its customers, including Plaintiffs.  For each and all of these reasons, AMERIPRISE and its agent Ghazanfari were Plaintiffs' fiduciaries.

59.  Defendant AMERIPRISE and its agent Ghazanfari had a fiduciary duty to only solicit investments and enter into transactions that were for the primary benefit of Plaintiffs, and not for their primary benefit.

60.  On or about mid-June of 2018, AMERIPRISE, acting through its agent Ghazanfari, advised, recommended and persuaded the Trust to surrender the Sun Life annuity and to use the proceeds of the surrender to purchase the RiverSource annuity.  Plaintiffs are informed and believe, and thereon allege, that AMERIPRISE and its agent Ghazanfari received substantial commissions as a result of the foregoing recommendations and advice.   Plaintiffs are informed and believe, and thereon allege, that AMERIPRISE and its agent Ghazanfari's primary motivation for advising, recommending and persuading the Trust to surrender the Sun Life annuity and use the proceeds of the surrender to purchase the RiverSource annuity was to obtain commissions for themselves and to benefit AMERIPRISE, which owns RiverSource.

61.  Plaintiffs trusted Ghazanfari, who had been the longtime financial advisor for the Trust's settlor, J. Marshall.  Plaintiffs were not knowledgeable about investments or variable annuities.  Plaintiffs relied completely upon Ghazanfari's advice in investing their monies.  For each and all of these reasons, AMERIPRISE, through its agent Ghazanfari, controlled Plaintiffs' accounts.

62.  In churning the Trust's monies from the Sun Life annuity into the RiverSource annuity as set forth above, AMERIPRISE, through its agent Ghazanfari, acted willfully, recklessly, and with conscious disregard for the Trust's best interests.

63.  As a direct and proximate result of the churning alleged herein, the Trust has been damaged in a sum according to proof.

64.  The churning alleged herein was malicious, willful, despicable, and oppressive. Plaintiffs are informed and believe, and thereon allege, that the churning alleged herein was ratified by a managing agent of AMERIPRISE.  Accordingly, punitive damages are warranted against Defendant AMERIPRISE.

/ / /

/ / /

## FIFTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

65.   Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs, as if set forth fully herein.

66.   Plaintiff trusted and relied upon AMERIPRISE and its agent, Ghazanfari. AMERIPRISE, through its agent Ghazanfari, encouraged such trust and confidence. AMERIPRISE, through its agent Ghazanfari, held itself out as an expert in the areas of investments, securities and financial planning.  AMERIPRISE, through its agent Ghazanfari, offered financial and investment advice to Plaintiffs. Ghazanfari was Plaintiff's registered representative, securities broker and financial advisor.  Ghazanfari was a licensed securities registered representative, authorized agent, apparent agent and employee of AMERIPRISE, at all relevant times, who was acting in the scope and course of his employment in making the securities recommendations at issue herein.  AMERIPRISE, at all relevant times, was a licensed securities broker-dealer charged with responsibility for supervising its registered representatives, including Ghazanfari, and protecting its customers, including Plaintiffs.  For each and all of these reasons, AMERIPRISE and its agent Ghazanfari were Plaintiffs' fiduciaries.

67.   AMERIPRISE and its agent Ghazanfari  had a fiduciary duty to determine Plaintiffs' income, financial situation, needs, risk tolerance, investment goals and time horizon. AMERIPRISE and its agent Ghazanfari had a fiduciary duty to only make financial and investment recommendations, and engage in transactions, which were suitable in light of Plaintiffs' income, financial situation, needs, risk tolerance, investment goals and time horizon. AMERIPRISE and its agent Ghazanfari had a fiduciary duty to scrupulously refrain from soliciting or engaging in any investment or transaction, unless they had an affirmative objectively reasonable belief that the investment or transaction was suitable for Plaintiffs. AMERIPRISE and its agent Ghazanfari had a fiduciary duty to fully disclose all material facts concerning their financial advice, and the investments and transactions they recommended to

Plaintiffs and in which they engaged in a manner that was reasonably understandable to the Plaintiffs.  AMERIPRISE and its agent Ghazanfari had a fiduciary duty to explain the nature and risks of their recommendations and transactions to Plaintiffs, in an understandable way. AMERIPRISE and its agent Ghazanfari had a fiduciary duty to only make recommendations, and engage in transactions, that were for the primary benefit of Plaintiffs, rather than for their primary benefit.

68.   AMERIPRISE had a fiduciary duty to review all transactions made by its registered representative and agent, Ghazanfari, so as to ensure that he was properly managing Plaintiffs' money.  Defendant AMERIPRISE had a fiduciary duty to review all transactions made by its registered representative and agent, Ghazanfari, so as to ensure that he was only making recommendations and investments that were suitable for Plaintiffs.  Defendant AMERIPRISE had a fiduciary duty to review all transactions made by its registered representative and agent, Ghazanfari, to ensure that he was only engaging in transactions for the benefit of Plaintiffs, rather than the primary benefit of himself and AMERIPRISE.  Defendant AMERIPRISE had a fiduciary duty to ensure that its registered representative and agent, Ghazanfari, did not cause Plaintiffs' monies to become over-concentrated into any one type of investment.  Defendant AMERIPRISE had a fiduciary duty to ensure that Ghazanfari did not make material omissions in the course of soliciting any investment or transaction.  Defendant AMERIPRISE had a fiduciary duty to ensure that Ghazanfari disclosed all material facts in the course of soliciting any investment or transaction.  Defendant AMERIPRISE also had a fiduciary duty to have a system of supervision and internal controls in place, which would prevent fraud and wrongful conduct on the part of the registered representatives under its supervision.

69.   Defendant AMERIPRISE, acting through its registered representative and authorized agent, Ghazanfari, breached its fiduciary duty to Plaintiffs in each and all of the following ways:

A.   Ghazanfari failed to adequately explain the nature, risks, costs, anticipated return, tax ramifications, and downsides of purchasing variable annuities in a manner that was reasonably understandable to the Plaintiffs;

B.  Ghazanfari advised and recommended to J. Marshall that he purchase the Sun Life annuity and the Met Life annuities.  These annuities were completely unsuitable for J. Marshall in light of his age, income, financial situation, investment goals, risk tolerance, and financial and investment needs, and insurance needs;

C.  Ghazanfari advised and recommended to the Trust that it surrender the Sun Life annuity and use the surrender payment to purchase the RiverSource annuity.  Those recommendations annuities were completely unsuitable for the Trust in light of its financial situation, investment goals, and risk tolerance;

D.  Ghazanfari added lifetime income riders to each of the annuities.  The income riders were completely unsuitable in light of Plaintiffs' income, financial situation, and investment goals and only served to increase Plaintiffs' costs and maximize Ghazanfari's and AMERIPRISE's commissions;

E.  Ghazanfari made investment recommendations which primarily benefited himself and AMERIPRISE, and provided no benefit to Plaintiffs, by recommending that Plaintiffs purchase the variable annuities;

F.  Ghazanfari made investment recommendations which primarily benefited himself and AMERIPRISE, and provided no benefit to the Trust, by recommending that the Trust surrender the Sun Life annuity as soon as the surrender period had ended, and use the proceeds to purchase the RiverSource annuity, thereby locking the Trust into a new seven-year annuity contract;

G.  Ghazanfari recommended and advised Plaintiffs to invest a substantial amount of their monies into the annuities, which locked up their monies for years, and which had high costs and fees which eroded much of the potential for growth;

H.  Ghazanfari recommended and advised Plaintiffs to invest their monies into the annuities, even though the Plaintiffs had no need or desire for the purported insurance benefits of variable annuities, or for riders that purported to provide an immediate income benefit;

/ / /

/ / /

I.   Ghazanfari recommended and advised Plaintiffs to invest a significant percentage of their investment assets into variable annuities, thereby causing their accounts to become over-concentrated into variable annuities;

J.   Ghazanfari recommended investments which paid significantly more in commissions than suitable investments which he could have utilized for Plaintiffs;

K.   Ghazanfari failed to comply with industry rules regarding suitability.

67.   AMERIPRISE further breached its fiduciary duty in each and all of the following ways:

A.   AMERIPRISE authorized, approved and/or ratified Ghazanfari's conduct;

B.   AMERIPRISE failed to have an adequate system of supervision and internal controls in place, which would have prevented and/or corrected Ghazanfari's conduct, thereby disregarding its duty to provide effective supervision;

C.   AMERIPRISE failed to adequately supervise Ghazanfari, and the advice, transactions, and recommendations that he made;

D.   AMERIPRISE failed to adequately review the transactions and investments Ghazanfari recommended and made on Plaintiffs' behalf;

E.   AMERIPRISE failed to take adequate preventative and/or corrective action to stop and/or remedy Ghazanfari's misconduct.

70.   AMERIPRISE knew, or reasonably should have known, at all times herein relevant, of the breaches of fiduciary duty which are alleged herein.

71.   Plaintiffs reasonably trusted and relied upon AMERIPRISE and its agent Ghazanfari, who were their fiduciaries.

72.   As a direct and proximate result of the breaches of fiduciary duty, alleged herein, Plaintiffs have suffered damages in an amount according to proof.

73.   As a direct and proximate result of the breaches of fiduciary duty alleged herein, Plaintiffs have suffered substantial financial losses which have resulted in severe emotional distress.

/ / /

74.  AMERIPRISE's conduct, in breaching its fiduciary duties as alleged herein, was malicious, willful, despicable, and oppressive, if and to the extent such conduct is based upon what AMERIPRISE knew as opposed to what it reasonably should have known.  Accordingly, punitive damages are warranted against AMERIPRISE, to the extent its breaches of fiduciary duty were willful.

75.  Plaintiffs are informed and believe, and thereon allege, that Ghazanfari's breaches of fiduciary duty were malicious, willful, despicable, and oppressive, if and to the extent such conduct is based upon what Ghazanfari knew as opposed to what he reasonably should have known.  Plaintiffs are further informed and believe, and thereon allege, that Ghazanfari's breaches of fiduciary duty, alleged herein, were ratified by a managing agent of AMERIPRISE. Accordingly, punitive damages are warranted against Defendant AMERIPRISE, if and to the extent that Ghazanfari's breaches of fiduciary duty were willful.

## SIXTH CAUSE OF ACTION

## RESCISSION

### (Against All Defendants)

76.  Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs, as if set forth fully herein.

77.  On or about June 19, 2018, the Trust entered into an annuity contract with RiverSource, which is an entity affiliated with and controlled by AMERIPRISE.

78.  Plaintiffs are informed and believe, and thereon allege, that the foregoing contract is properly subject to rescission on the following grounds:

A.  The contract was procured by fraud in the form of intentional misrepresentations and/or knowing omissions of material fact by Ghazanfari, who was an authorized agent and/or apparent agent of AMERIPRISE, as alleged herein;

B.  The contract was procured by mutual mistake in the form of innocent misrepresentations and/or inadvertent omissions of material fact by Ghazanfari, who was an

/ / /

authorized agent and/or apparent agent of AMERIPRISE, as alleged herein.  Plaintiffs were unaware of the true facts;

C.  The contract was procured by undue influence.  Plaintiffs trusted and relied upon Ghazanfari, who was an authorized agent and/or apparent agent of AMERIPRISE at all relevant times.  The Trust followed Ghazanfari's advice to purchase the RiverSource annuity.  Ghazanfari encouraged such trust and reliance.  Ghazanfari was Plaintiffs' fiduciary.  AMERIPRISE, through its agent Ghazanfari, engaged in undue influence justifying rescission by taking advantage of the fiduciary relationship between Ghazanfari and Plaintiffs for its own benefit, as alleged herein.

79.  For each and all of the foregoing reasons, the Trust is entitled to rescission of its contract with RiverSource/AMERIPRISE, and to the return of all monies which the Trust paid for the RiverSource annuity, plus interest thereon at the legal rate, pursuant to California Civil Code Section 1689.

**WHEREFORE**, Plaintiffs pray judgment as follows:

1.  For compensatory damages in an amount according to proof;

2.  For rescission of the Trust's contract with RiverSource/AMERIPRISE, and for recovery of the consideration paid for that investment, plus interest at the legal rate, upon tender of the investment, which is hereby made, pursuant to California Civil Code § 1689;

3. For damages in an amount according to proof for emotional distress and mental suffering;

4.  For punitive and exemplary damages in an amount sufficient to dissuade Defendant from repeating its misconduct, and to serve as an example to similarly situated Defendants;

5.  For costs of suit herein; and

6.  For such other and further relief as this honorable court may deem just and proper.

Date: January 8, 2024                    **LAW OFFICES OF MELINDA JANE STEUER**

By: _____
                    Melinda Jane Steuer
                    Attorney for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims triable by jury.

Date: January 8, 2024                    **LAW OFFICES OF MELINDA JANE STEUER**

By: _____
                    Melinda Jane Steuer
                    Attorney for Plaintiff